**UNITED STATES of America,
Plaintiff,**

**v.**

**SYBRON CORPORATION, Defendant.**

**Civ. A. No. 41254.**

United States District Court,
E. D. Pennsylvania.

June 30, 1971.

Donald F. Melchior, Roy E. Green, Roy L. Ferree, Dept. of Justice, Washington, D. C., for plaintiff.

Robert A. Bicks, David S. Patterson, Charles Kadish, Paul E. Arneson, Edwin P. Rome, Blank, Rome, Klaus & Comisky, Philadelphia, Pa., Breed, Abbott & Morgan, New York City, for defendant.

## OPINION AND ORDER

FULLAM, District Judge.

This is a civil antitrust action brought by the government challenging the April 1965 merger of the Ritter Company, Inc., a manufacturer of dental products, and the M. F. Patterson Dental Supply Company, a retailer of dental products, as violative of Section 7 of the Clayton Act, 15 U.S.C. § 18. Two other related cases challenging forward vertical acquisitions in the dental products industry have been disposed of by voluntary settlement.[1]

After reviewing the entire record and considering the proposed findings of fact and conclusions of law submitted by counsel, I make the following

## FINDINGS OF FACT

1. Defendant, Sybron Corporation (hereinafter Sybron), is a New York corporation with its principal place of business in Rochester, New York.

2. Sybron transacts business in the Eastern District of Pennsylvania.

3. Sybron is engaged in interstate commerce at both the manufacturing and retailing levels.

4. Sybron is a diversified company with divisions and subsidiaries engaged in the manufacture of products for the medical and dental professions, hospitals, and waste treatment.

(a) The orginal Ritter Dental Manufacturing Company was founded in 1887 to manufacture products for the dental profession. By the 1920's, the company was publicly held. In later years the operating function of the company was conducted under the name Ritter Equipment Co.

(b) On June 5, 1957, the Ritter Company, Inc., the holding company, acquired Liebel-Flarsheim Co., located in Cincinnati, Ohio. Liebel-Flarsheim Co. manufactured x-ray specialties as components for other x-ray machine manufacturers, and miscellaneous medical equipment.

The total 1956 sales of Liebel-Flarsheim were approximately $3,000,000. This company is presently operated as a subsidiary of Sybron.

(c) In June of 1959, Wilmot Castle Company was acquired by Ritter Company, Inc. Wilmot Castle's annual sales for 1958 were approximately $7,000,000 in hospital equipment (sterilizers, lights and tables), and $2,500,000 in lights and sterilizers for the dental and medical profession.

(d) In April of 1964, Ritter Company, Inc. acquired the Kerr Manufacturing Company of Detroit, Michigan. Kerr was founded in 1891, and has served the dental profession since that time by supplying a large line of dental sundries and instruments. Kerr's gross sales in 1963 of $4,471,832 made it one of the strongest competitors in the sundries segment of the dental products field. Kerr is presently operated as a subsidiary of Sybron.

(e) In April of 1965, the M. F. Patterson Dental Supply Company and the Ritter Company, Inc. merged to form the Ritter Corp. (hereinafter the merger). Patterson was the largest independent dental supply store chain in the nation with its 41 stores almost exclusively located west of the Mississippi River. In addition, Patterson controlled General Refineries, a manufacturer of precious metal products for the dental profession. Prior to trial of this case, Sybron divested itself of General Refineries.

(f) In late 1965, the Ritter-Pfaudler Corporation was formed by the merger of Ritter Corporation and Pfaudler Permutit, Inc. Pfaudler's activities were not related to the dental products field. In 1968, Ritter-Pfaudler changed its name to the Sybron Corporation.

(g) Since 1965, Sybron has made one minor acquisition in the dental products field and purchased the inventories of two companies going out of business. Numerous non-dental related companies have also been acquired by Sybron.

1. United States v. Pennsalt Chemicals Corp. and S. S. White Co., C.A. 41252 (E.D.Pa.) and United States v. Dentists' Supply Co., C.A. 41253 (E.D.Pa.).

5. In 1964, the Ritter Company, Inc. (including Kerr) had net sales of $41,598,000; of which dental equipment accounted for 46%, dental sundries 13% medical and hospital equipment 37%, x-ray specialties 4%.

6. On a pro forma combined basis for the year 1964, Sybron (Ritter and its related companies and Pfaudler and its related companies) had net sales of $119,335,000 and total assets of $97,166,000 as of June 30, 1965. By 1968, Sybron had total sales of $264,570,000 and assets of $229,177,000. Dental products sales in 1968 accounted for 19% of Sybron's total sales.

7. As Finding Number 4 indicates, the Ritter Company, Inc., has engaged in a significant diversification program, and dental product expansion program through acquisitions and mergers over the last 15 years. The purpose of these programs was twofold: to lessen the difficulties associated with the annual cyclical demand curve and long-term cyclical fluctuations in the dental products industry; and to achieve greater growth potential.

8. Dental products, consisting of the sum total of equipment, sundries, artificial teeth, and precious metals purchased and utilized by dentists and dental laboratories, is a recognized market in the industry.

9. Dental equipment, consisting of durable products such as dental chairs, units, x-ray machines, sterilizers, lights and cabinets, is a recognized submarket of the dental products market.

10. Dental sundries, consisting primarily of nondurable consumable dental products such as filling material, anesthetics, impression materials, waxes, cements, dental chemicals, non-precious metals, and instruments, is a recognized submarket of the dental products market. A particular instrument or small piece of equipment is considered a sundry if its price is less than $200 per unit.

11. Sybron manufactures dental equipment through the Ritter Equipment Company, and sundries through the Kerr Manufacturing Company.

12. The following table shows Sybron's share of manufacturers' sales of dental products for 1963 through 1968:

UNITED STATES SALES OF DENTAL PRODUCTS
(thousands of dollars) [1]

| Year | Sybron Sales [2] | Total U. S. Sales | Sybron Sales as a Percentage of Total U. S. Sales |
|---|---|---|---|
| 1963 | 14,996 | 171,279 | 8.8% |
| 1964 | 16,401 | 178,815 | 9.2 |
| 1965 | 17,849 | 210,331 | 8.5 |
| 1966 | 16,670 | 224,033 | 7.4 |
| 1967 | 17,042 | 240,713 | 7.1 |
| 1968 | 18,041 | 267,913 | 6.7 |

1. United States total excludes all direct sales to consumers while Sybron equipment sales exclude all direct sales except to dental schools.

2. Ritter and Kerr before merger.

13. As of 1963, there were 302 manufacturers of dental products in the United States. Approximately 50 companies accounted for over 85% of sales; and four companies accounted for over 35% of sales. These figures exclude import sales, and can be accepted only as a rough approximation of the concentration in the dental products market as of 1963. Moreover, there have been many new entrants into the dental products field since 1963.

14. Sybron's dental equipment line is comprised primarily of the larger and more expensive items used by dentists, such as patient chairs, x-ray machines, dental units, operating lights, sterilizers and controls.

15. Sybron's dental equipment is marketed through dental supply houses, except for governmental purchases and large orders placed by dental schools. Approximately 250 dental dealers through the nation carry Sybron's equipment.

16. Through the Kerr Company Sybron markets a wide variety of dental sundries to the dental profession. All but a small percentage of sales are made to approximately 300 dental dealers.

17. The following table shows Sybron's share of manufacturers' sales of dental equipment and dental sundries for 1963 through 1968:

TOTAL UNITED STATES SALES OF DENTAL
EQUIPMENT AND DENTAL SUNDRIES
(thousands of dollars) [1]

| | Sybron Sales [2] | | Total U. S. Sales | | Sybron as a Percentage of Total U. S. Sales | |
| Year | Equip. | Sundries | Equip. | Sundries | Equipment | Sundries |
|---|---|---|---|---|---|---|
| 1963 | 11,804 | 3,192 | 48,383 | 83,806 | 24.4% | 3.8% |
| 1964 | 12,681 | 3,720 | 52,065 | 85,921 | 24.4 | 4.3 |
| 1965 | 13,386 | 4,463 | 63,374 | 98,483 | 21.1 | 4.5 |
| 1966 | 12,402 | 4,268 | 68,518 | 104,406 | 18.1 | 4.1 |
| 1967 | 11,435 | 5,607 | 74,591 | 111,505 | 15.3 | 5.0 |
| 1968 | 11,490 | 6,551 | 81,481 | 124,368 | 14.1 | 5.3 |

1. United States total excludes all direct sales to consumers while Sybron equipment sales exclude all direct sales except to dental schools.

2. Ritter and Kerr before merger.

18. In the late 1950's, the dental equipment market was highly concentrated in three firms; Ritter, S. S. White Co. and Weber Dental Manufacturing Co.

19. During the early 1960's, coincidental to the dental profession's trend toward the practice of sit-down dentistry rather than stand-up dentistry, the market shares of the big three equipment manufacturers began to decline, and new entrants in the major categories of equipment began making significant inroads into the equipment market.

20. Since 1960, the following companies have entered the dental products industry at the manufacturing level and attempted to market on a national level.

(a) Dental chairs: Boyd, Cascade, Coastal Dynamics Corp., Den-Tal-Ez Chair Mfg. Co. F & F Koeneghramer, Peccia & Carnese, Scope, Inc., Siemens Medical of America and Virginia Corporation.

(b) Dental units: A-Dec, Chaynes Dental Instrument Corp., Coastal Dynamics, Cox Manufacturing Co., Dri-Clave, Encore, Midwest Division of American Hospital Supply, Pelton & Crane, Roland Manufacturing Co., Siemens Medical of America, Sprague, Swivelstool, Inc., Turner.

21. In the case of dental x-rays and dental lights, it is not clear that there have been any new entrants since 1963. However, in both product categories existing competitors of Sybron have increased their shares of the respective product markets.

22. Many of these new entrants began by manufacturing one product or type of equipment, e. g., chairs. Specialization in one type of equipment and perceptive recognition of developing trends and needs of the dental profession resulted in the products being well received by the dental profession.

23. The following table shows Sybron's sales of equipment in five main categories of equipment:

| YEAR | LIGHTS | CHAIRS | X–RAYS | UNITS | STERILIZERS |
|---|---|---|---|---|---|
| 1964 | $766,202 | $3,143,282 | $1,047,501 | $6,575,696 | $179,864 |
| 1965 | 692,124 | 4,474,063 | 964,009 | 6,099,472 | 315,076 |
| 1966 | 727,649 | 4,198,546 | 1,168,487 | 5,849,873 | 224,798 |
| 1967 | 501,895 | 5,272,026 | 944,407 | 5,652,211 | 218,476 |
| 1968 | 482,371 | 3,466,756 | 930,165 | 5,527,296 | 173,428 |

24. The table set out in Finding Number 23 shows Sybron's decline in absolute dollars of sales, notwithstanding price increases. In each category new entrants have been successful in penetrating and acquiring substantial portions of the market, or Sybron has lost its market share to other established competitors.

25. Sybron's decline in equipment sales, and the contemporaneous success of new entrants is primarily attributable to the change in dental practice from stand-up dentistry to sit-down dentistry. Recent graduates entering into practice for the first time account for a substantial portion of new equipment sales each year, and most have been trained in sit-down dentistry.

26. Sybron did not respond to changing demand in the dental profession. For years new entrants had products available suitable for sit-down dentistry, whereas Sybron has updated its product line only within the last few years. There is reason to believe that Sybron's new product line will receive greater acceptance by the dental profession.

27. Generally speaking, there are no existing patents which prohibit new companies from entering the dental equipment market.

28. The technology associated with dental equipment design and manufacture is not unique to that industry.

29. The costs associated with the manufacture of a particular piece of equipment are relatively low. Even one of the highest cost items, the dental chair, retails in the $1,500 to $2,000 range. Based on the 35% markup of equipment and manufacturers' profit margins, a chair costs approximately $800 to $1,200 to manufacture.

30. Some of the most significant entrants in the dental equipment market started as part-time ventures on a one-unit-at-a-time basis.

31. Dentists, by and large, purchase almost exclusively from dental dealers. Consequently, market penetration by any manufacturers of dental products, and particularly equipment manufacturers, is directly related to dealer acceptance.

32. The relationship of the dental dealers sales force to the dental profession accounts for the significance of the dental dealer. Dental supply salesmen call regularly on dentists and dental laboratories. The salesmen not only take orders for the high volume items ordered on a regular basis by the dentists, but also detail or promote new products sold by the dental dealer. Dentists acquire product information through this detailing process. It is common that a dentist will order a low-cost product solely on a salesman's recommendation.

33. It is not possible for a dental dealer actively to promote all products which he markets. Even when a dealer accepts a manufacturer's product, appreciable sales will usually be generated only if the dealer promotes the product.

34. Direct sales from the manufacturer to the dentist can sometimes be effective in areas near the manufacturer's place of business, but even where a dentist chooses a product through a direct manufacturer's contact, he frequently insists upon receiving it through a local dealer.

35. There are approximately 100,000 dentists in this country. Products for sale to dentists are advertised in professional publications. In addition, the numerous dental association meetings on the national, regional and local levels provide an opportunity to promote products to a large number of dentists at a reasonable cost.

36. As a matter of custom, in the dental industry equipment is serviced by the dental dealers. Absent dealer acceptance, marketing by a new equipment manufacturer is difficult because of the dentist's reluctance to purchase equipment without a local dealer available to do the servicing.

37. The sundries market is comprised of approximately 20,000 items (including different sizes of instruments, etc.). There are innumerable companies manufacturing dental sundries. There is no proof as to the exact number of manu-

facturers, but it is estimated that there are 300 to 500 sundry manufacturers, of which about one-half market on a national basis.

38. The barriers to entry into the sundries market on an item-by-item basis are very low. There are four or five leading companies, including Kerr, which market a broad line of sundries, and account for a significant percentage of the dollar volume of sundries sales. No one sundry manufacturer supplies a complete line of sundries.

39. A new competitive factor in the sundries field may emerge in the future. Various dental dealers are considering, or have implemented on a small basis, the practice of purchasing sundries and then marketing them under a private label, or house label.

40. M. F. Patterson Co. was founded in 1877 as a dental products distributor. By internal expansion and acquisition, Patterson has grown to be the largest dental retail chain west of the Mississippi River and one of the three largest in the United States.

41. A full-line dental dealer sells dental equipment, sundries, precious metals, teeth, and repair parts for equipment, and also services the equipment it sells. Full-line stores also provide the following benefits to the dental profession: product information, financing, large stocks and prompt delivery, and technical advice relating to office location, financing and design.

42. A non-full-line dental dealer is usually a retailer who does not market equipment.

43. Sundry products are also marketed by mail order enterprises specializing in high volume sundry items. Mail order houses are a factor in the retail market.

44. Through its three dental school branches, and its full-line stores in proximity to dental schools, Patterson endeavors to develop a professional relationship with dental students. Upon graduation, Patterson provides assistance to the new dentist in locating, designing and equipping his offices.

45. Patterson is operated as a separate entity by Sybron, and in turn each Patterson dealership is operated on its own profit account. Each branch manager selects his suppliers from an authorized list of approximately 800 suppliers and regulates his inventory to accommodate local preferences and demand. Marketing emphasis on particular products is determined by each branch manager.

46. Local Patterson dealers do not purchase from a new supplier until the Patterson home office has approved the supplier. Approval is determined on the basis of the supplier's financial position, contract terms, profit margins, credit and return policies and whether the supplier has product liability insurance. In equipment purchases Patterson considers factors more directly related to the product's quality, including the experience of dentists who have purchased the product, availability of repair parts, caliber of the supplier's service organization and the potential market for the product.

47. As of 1963, 428 firms controlled 622 dental dealers. Three chains had a total of 100 branches accounting for approximately 20% to 25% of retail sales. Four other firms owned a total of 39 retail stores. By 1967, the three leading firms or chains controlled 128 stores (Dentists' Supply Co.—48, S. S. White —42, Patterson—38).

48. On July 31, 1963, Dentists' Supply Company of New York, the dominant domestic manufacturer of teeth (over 60% of the domestic market), acquired L. D. Caulk Company, a substantial manufacturer of dental sundries and the third largest dental dealer chain in the nation. In October of 1964, Dentists' Supply acquired Ransom & Randolph, a sundries manufacturer and the fourth largest dental dealer chain in the country. Three other dental dealers were acquired on December 31, 1964 by Dentists' Supply: H. S. Moore, Inc., Harris Dental Co., Inc., and Mercirex Co. In 1966, Dentists' Supply dealers accounted for 8% of retail sales.

49. S. S. White Dental Manufacturing Co. is one of the major equipment

and sundry manufacturers in the nation. Through an acquisition program dating back to 1928 and continuing through 1965, S. S. White acquired 29 dental dealers. By 1966, it controlled 8% of the retail market.

50. For the period 1963 through 1966, Patterson, S. S. White and Dentists' Supply accounted for approximately 24% of the retail market, with each chain having approximately 8% of the market.

51. For the period 1960 through 1966, Dentists' Supply sales of teeth to Caulk and Ransom & Randolph remained stable. There is no indication that Caulk or Ransom & Randolph purchased more teeth from Dentists' Supply after their acquisition by Dentists' Supply.

52. From 1960 to 1966, S. S. White's percentage of wholesale sales to its dental dealers declined substantially. During the same period, S. S. White's national sales also declined.

53. By 1968, Dentists' Supply had sold its dental dealer chain to Litton Industries. This complete divestiture was not required by the consent judgment entered in United States v. Dentists' Supply Co., C.A. 41253 (E.D.Pa.).

54. Pursuant to the decree entered in United States v. Pennsalt Chemicals Corp. and S. S. White Company, C.A. 41252 (E.D.Pa), S. S. White has divested about one-sixth of its stores. S. S. White retailers still account for about 7% of the retail market.

55. The following tables show Patterson's share of the dental products retail market, and Patterson's purchases from Sybron.

(Thousands of Dollars)
SALES

| Year | Patterson | All U. S. Dealers of Dental Products | Patterson as Percent of U. S. Total |
|---|---|---|---|
| 1963 | 18,742 | 254,500 | 7.4% |
| 1964 | 20,409 | 265,693 | 7.7 |
| 1965 | 21,612 | 312,515 | 6.9 |
| 1966 | 21,612 | 332,787 | 6.5 |
| 1967 | 22,616 | 357,686 | 6.3 |
| 1968 | 25,011 | 398,104 | 6.3 |

PURCHASES

| Year | From all Manufacturers | From Sybron | From Sybron as Percent of From all Manufacturers |
|---|---|---|---|
| 1963 | 11,630 | not available | |
| 1964 | 12,540 | 2,371 | 18.9% |
| 1965 | 13,290 | 2,258 | 17.0 |
| 1966 | 14,247 | 2,304 | 16.2 |
| 1967 | 14,248 | 2,050 | 14.4 |
| 1968 | 16,241 | 1,937 | 11.9 |

56. Patterson's share of the retail market for dental products can be further refined for the appropriate submarkets—dental equipment 8%, dental sundries 7.5%. These figures are for 1963 only; however, there is no indication that an appreciable variation has taken place.

57. During the early 1960's, Ritter's management actively considered the advisability of expanding its product-line and/or entering the retail market through an acquisition or acquisitions. Dentists' Supply's acquisition of Caulk and Ransom & Randolph, two of the leading integrated sundry manufacturers, caused concern at Ritter because both Caulk and Ransom & Randolph were potential merger partners for Ritter.

58. Dentists' Supply's acquisitions were coincidental to industry rumors that Dentists' Supply had plans to enter the equipment market. Ritter management was concerned that it might lose the support of the Dentists' Supply dealers if Dentists' Supply entered the manufacturing market.

59. Ritter viewed consolidation of Caulk and Ransom & Randolph via acquisition by Dentists' Supply as contrary to its business interest because it reduced the number of independent chains marketing Ritter equipment. Ritter's management feared a substantial impact might occur to its operation if Dentists' Supply deemphasized Ritter equipment in its marketing. In addition to a reduction in sales volume, they feared Ritter's image in the industry would be adversely affected.

60. The acquisition of Caulk and Ransom & Randolph left Patterson, long a

high-volume Ritter purchaser, as the major dental dealer chain not affiliated with a manufacturer. Acquisition of Patterson by Ritter was the logical step for entry into retailing by Ritter.

61. In 1968, the Rower Dental chain was formed with 36 to 41 stores. In addition, four independents, Climax, Davidson, Keener and Tri-State, have recently merged.

62. The capital necessary to establish a full-line dental dealership is approximately $100,000 for inventory. A substantial amount of working capital is also necessary.

63. There is a shortage of trained sales and service personnel available to the new dental dealer.

64. Operation of a full-line dental dealership requires expertise in the dental product market, but this is not difficult to acquire.

65. Obtaining product lines to market is a significant factor in the success of a new dealer entrant. Sybron (i. e., Ritter and Kerr) does not recognize every dealer interested in carrying its products. In addition to a dealer's sales and service capabilities, Sybron considers its present market coverage in a given area. If sufficient market coverage exists, Sybron will not recognize a new dealer, or even an established dealer.

66. Many other manufacturers apply similar recognition criteria.

67. Sybron's recognition policy also excludes non-recognized dealers from purchasing repair parts to service Sybron equipment.

68. Sybron's present recognition policy is the same policy which Ritter and Kerr utilized prior to their consolidation into one firm.

69. The dealer members of the American Dental Trade Association account for over 60% of total national retail sales of dental products.

70. It is estimated that the dental retailers generate annual profits of approximately 4% before taxes.

71. The growth potential of dental products retailing is considered good.

72. Dentists, as a class, are discerning consumers. By their professional training and continuing education after graduation from dental school they are made aware of the developing techniques in the practice of dentistry, and the products available to practice these techniques.

73. The majority of dentists are active in either local or national professional associations. One aspect of dental professional association meetings is product displays by manufacturers and retailers. Dentists acquire product information by attending professional association meetings.

74. Product information is also disseminated by the dental dealers' salesmen during their regular calls on dentists.

75. A dentist may or may not accept a retailer's recommendation relating to the purchase of a particular product. In purchases of the higher cost equipment items the dentist is more likely to spend the time and effort necessary to examine competing products for quality and design before making his decision.

76. The ability of a dental dealer to influence a dentist's purchase of a particular product depends on many variables. The dealer's recommendation is, however, an important factor in a dentist's purchasing decision. When the product purchased is to be serviced by the dealer, the dentist considers the dealer's experience with product failures and the availability of repair parts.

## DISCUSSION

There are a few preliminary points that should be mentioned before discussing the ultimate issue. One of the issues litigated by the parties related to the size or universe figure for the dental products market. My findings reflect an acceptance of the defendant's statistics. This conclusion is based upon the fact that the litigants agreed on the overall retail sales of dental products, but had a

significant difference in their proposed market universes at the manufacturing level. The defendant worked back from the retail sales to a manufacturing universe. On the other hand, the plaintiff relied solely on the reported figures in the 1963 Census of Manufacturers. The disparity between the government's manufacturing universe and the agreed retail market is so great, even after consideration of the reporting variables and omissions in the Census figures, that I was unable to accept the government's manufacturing statistics. While the defendant's figures also leave something to be desired, on balance, they appear to be a truer reflection of the size of the respective markets.

The difficulties experienced in the creation of the market statistics derive from the overall lack of available statistics in the dental industry. Under these circumstances, it is understandable, but unfortunate, that a certain degree of vagueness permeates the statistical facet of this case. I have also accepted the defendant's position that direct sales to governmental units are not properly part of the market.

█ Secondly, my findings are addressed to three lines of commerce: the dental products market and the two submarkets of dental equipment and sundries. The government contends that two additional submarkets, dental x-ray equipment and dental professional equipment, should also be found to exist. As to dental professional equipment, this proposed submarket does not accord with industry recognition or meet any of the other tests set out in Brown Shoe Co. v. United States, 370 U.S. 294, 325–328, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1966) for market identification. Dental x-rays, on the other hand, could be considered an appropriate submarket, if reliable market statistics were available. The universe figure for this market was derived from a magazine article, the author of which was not called as a witness, and the only authentication of the figures was the opinion of the government's expert that the author of the article was recognized

as a sound economist. The government must do more to carry its burden of proof.

I have recently set out the frame of reference for consideration of vertical mergers.

"The guidelines for application of Section 7 to vertical mergers are not clearly etched. The case law has not developed rapidly, and the principles evolving from the cases are complex. As stated by Professor Turner:

'Vertical acquisitions seem to stand on a middle ground. Generally speaking, the anti-competitive consequences of a vertical merger appear more remote than those of a horizontal merger of substantial competitiors, since the vertical merger * * * does not per se increase the market position of merged companies in either of the two markets involved.' Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1321 (1965).

"However, a particular vertical merger may result in the transfer of oligopolistic market conditions from one marto another, or in other anti-competitive effects." United States Nuclear Corp. v. Combustion Engineering, Inc., 302 F.Supp. 539, 555 (E.D.Pa.1969).

The defendant's position is difficult to maintain, when measured against the market share statistics in other vertical cases, *Brown Shoe,* supra; United States Steel Co. v. F.T.C., 426 F.2d 592 (6 Cir. 1970); United States v. Ford Motor Co., 286 F.Supp. 407 (E.D.Mich.1968), probable jurisdiction noted, 403 U.S. 903, 91 S.Ct. 2204, 29 L.Ed.2d 679 (1971); United States v. Kimberly-Clark Corp., 264 F.Supp. 439 (N.D.Cal.1967); United States v. Standard Oil Co., 253 F.Supp. 196 (D.N.J.1966); United States v. Kennecott Copper, 231 F.Supp. 95 (S.D.N.Y.1964), aff'd per curiam, 381 U.S. 414, 85 S.Ct. 1575, 14 L.Ed.2d 692 (1965).

However, Sybron presses an argument which, although premised more on a behavioral supposition than traditional Section 7 criteria, has force. Plaintiff

and defendant appear to agree that profit is the motivation of private enterprise. The government reasons from this, in conformity with the vertical cases cited above, that once market power is united by vertical integration, profit factors dictate that the manufacturer will utilize its captive purchaser to insure a market for its product, and, consequently, foreclose others on both levels. Sybron reaches the opposite conclusion as to foreclosure based on an analysis of the dental retailing market. In essence, Sybron argues that the consumer of dental products, the dentist, is atypical in his buying patterns in that he is intelligent, has a preconceived purpose for products to fulfill, and is quality conscious. Assuming this factual premise, the argument follows that if Patterson dental dealers refuse to carry other manufacturer's products, the result will be that Patterson will lose sales, since a dentist may prefer a competitor's produce. The sale of another manufacturer's product generates a retail profit, and, therefore, Sybron argues that it is unrealistic to suppose it would give up both a manufacturing and retailing profit, when it can, in fact, make a profit on the retail sale of another's product.

Two forward vertical cases relied on by the government serve to highlight the defendant's position. In *Brown Shoe,* supra, there was never any question that if Brown Shoe supplied the shoes marketed by Kinney any adverse consumer reaction would result. In point of fact, the consumer at a Kinney retail store probably never knew who manufactured the shoes sold by Kinney. Essentially, it was possible for Brown to become Kinney's sole supplier, and this was Brown's precise intent. Similarly, in *Kimberly-Clark,* supra, there appeared to be quality standards which allowed a retailer to market any manufacturer's paper product as long as a particular standard was met. Again, foreclosure was possible, and post-acquisition evidence indicated that Kimberly-Clark was exercising its

control over the acquired retail chain to increase its sales.

■ Post-acquisition evidence introduced by Sybron indicates that since the merger Patterson's purchases of Ritter products have declined, while Kerr's sundry sales to Patterson have increased slightly. This evidence, of course, does not establish the legality of the merger. F.T.C. v. Procter & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); F.T.C. v. Consolidated Foods Corp., 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965); United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964). On the other hand, it is properly considered, along with the other evidence adduced, on the issue of the nature of the retail market.

Sybron's position goes to the core concept of foreclosure, by severing the traditionally accepted relationship of market share to market power. However, the market model posited by Sybron is overstated. The record fully supports the conclusion that dentists as a class are discerning consumers. But, dentists are also extremely busy professionals who rely to large extent on dental supply salesmen for product information. Naturally, buying judgment can be subtly influenced by a period of preconditioning. Moreover, when buying equipment which may need service, if an established full-line dental dealer does not carry the product, the dentist is reluctant to purchase the product. Conversely, it is perfectly clear that in most areas of the country, a dentist who desires a specific item can find a dealer to sell it to him. For instance, if Patterson does not carry a new chair line, another dealer somewhere will supply the dentist.

The sum of this is that absolute foreclosure similar to that in *Brown Shoe* and *Kimberly-Clark* would not be a profitable course for an integrated manufacturer in the dental industry to follow. Yet, there are many more subtle avenues available to an integrated firm to increase its manufacturing sales, without

risking retail sales. Marketing emphasis and persuasion are real factors that can influence a dentist's decision. *Cf.* F.T.C. v. Consolidated Foods Corp., 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965).

The above analysis is somewhat discordant with Sybron's post-acquisition sales record. Putting aside the issue of the probative value of post-acquisition statistics, there is an explanation of these statistics which cuts against the defendant's position. The 1960's was an atypical period of product development in the dental industry. The dentists wanted equipment compatible with sit-down dentistry. New entrants with new designs satisfying these needs successfully penetrated the market, cutting into Sybron's position. Sybron was not responsive to the demand for new equipment. In one sense this fact supports the defendant's hypothesis. But, as product differentiation levels off, the vertically integrated company will be invested with effective market power.

It is interesting to note that the defendant's economist indicated that as product differentiation leveled off, assumedly by development of Sybron's product line, the potential impact of the dental dealer would increase. Professor Gort did opine that he thought such a leveling off was not probable; however, there is little question in my mind that the extreme differences in equipment available from the respective competitors has already leveled off and product differentiation will be more modest in the future.

Another fact that must be considered is S. S. White's sales record. Undoubtedly, S. S. White's retail stores' sales of White equipment and sundries is much greater on a percentage basis than S. S. White's national market share. Similarly, Patterson while operating as an independent purchased Sybron dental products at about double Sybron's national market share. The inference, of course, is that the retailer can favor one manufacturer if he sees fit.

The management at Ritter during the early 1960's was concerned about maintaining its position in face of S. S. White's continuing acquisition program, and the possibility that one of the leading retailing chains would be acquired by a manufacturing competitor. Needless to say, all was not happiness at Ritter when Dentists' Supply acquired Caulk and Ransom & Randolph. To the extent that motivation for an acquisition is a relevant Section 7 criterion, Ritter's motivation must be characterized as defensive, which in turn leads to the conclusion that at the time of the merger Ritter's management felt that the other vertical acquisitions might be detrimental to Ritter's market position and that the Ritter-Patterson merger would help to preserve its market position.

Barriers to entry on the retailing and manufacturing level are significant. While it is true that a new entrant on either level can start up with modest capital expenditures and without expensive technological know-how, this is not the entire picture.

Market penetration by a new manufacturing entrant is difficult because of the obstacles associated with securing retail marketing sources. Although the reasons for the reluctance of dental dealers to take on new entrants' products are understandable, a hurdle to entry is created. Even after recognition by the leading dealers, promotion of a new entrant's product does not necessarily follow. It is true that if a new entrant can generate widespread demand by the dentists, dental retailers will eventually carry the product. While small size of the market facilitates direct marketing, the traditional relationship of the local dental dealer salesman and the dentist makes it difficult to succeed via this route. However, there are exceptions. For instance, Den-Tal-Ez started as a small operation marketing direct to dentists a few years ago, but today is a major supplier of dental chairs. The success of new entrants can be partly attributed to being in the right place at the right time to capitalize on the trend toward sit-down dentistry.

On the retail level, securing products to market is the key problem. Particularly difficult is entry as a full-line dental dealer, since it appears to be a common industry practice for manufacturers to recognize one, or a select few, dealers in a geographic area. Moreover, staffing and stocking of a service department is a formidable task. This is not to say that the new entrant cannot acquire any product lines. Naturally, new manufacturing entrants, or smaller existing manufacturers, are in need of retail outlets. The record also reflects that dentists find it convenient to deal with full-line dental dealers who carry the products of leading manufacturers. Therefore, the potential retail entrant is faced with the twin problem of needing an established trade to secure product lines and needing product lines to establish his relationship with local dentists.

There is little specific proof that the merger in question has increased the barriers to entry in absolute terms. However, potential entrants will be discouraged by the prospect of competing with powerful vertically integrated companies.

The government emphasizes the trend toward forward integration in the industry at the time of the merger was consummated. Certainly, the integration trend in the dental industry is not numerically comparable to the circumstances found in *Brown Shoe* or *Kimberly-Clark*. However, within a short period of time the three largest independent dental dealer chains were acquired by manufacturers: Dentists' Supply acquired L. D. Caulk Co. and Ransom & Randolph; Ritter acquired Patterson. As a result, 16% of the retail market was no longer independent, or stated another way, there was a 200% increase in the portion of the retail market controlled by manufacturers. There were no independent retail chains left of comparable size or importance for another manufacturer to acquire, after the above acquisitions were consummated.

The government also relies on what it considers to be anti-competitive characteristics of the dental products market.

Essentially, the government contends that there is some collusion between the manufacturers and retailers who are members of the American Dental Trade Association. The only fact in the record which supports this contention is that the retail members of the A.D.T.A. account for approximately 60% of all retail sales. The government then refers to a Federal Trade Commission consent decree entered in 1950 involving the A.D.T.A. and some of its members, and asks this Court, in effect, to draw the inference that the 60% figure could only be attained by violation of the decree. I find the government's position to be unfounded and inappropriate.

■ To summarize, barriers to entry are substantial on the manufacturing and retailing level; there was a trend toward vertical integration to the extent that S. S. White had a continuing acquisition program and the three largest independents were acquired within one year; one of the purposes of the merger was to secure a captive purchaser, to insure, at least, that Ritter equipment would continue to be the number one line of equipment of a prestige national retailer; the traditional assumptions concerning foreclosure are not, as such, applicable.

Market shares of the merged companies and concentration levels are the remaining factors to be considered. United States v. Philadelphia Natl. Bank, 374 U.S. 321, 363, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). The government's position based on market share analysis is strongest in the case of the dental equipment submarket. Using 1964 statistics, the last full year prior to the April 1965 merger, Ritter was the strongest equipment competitor with 24% of the national market, and Patterson was the largest independent dental retailing chain in the country with 8% of the market.

Concentration at the manufacturing level is significant: the three leading manufacturers, S. S. White, Weber and Ritter, control about 30% or 40% of the dental equipment market. Numerous single product or limited product line

companies account for the remaining portion of this market. Moreover, as already pointed out, barriers to entry are substantial.

Although it must be recognized that defendant's evidence and legal position relating to foreclosure challenges the very premise of Section 7's application to vertical mergers, I am not persuaded that foreclosure will not result. Rather, considering all the evidence, it is my conclusion that the merger may substantially lessen competition in the dental equipment submarket. Sybron's position in a sense seems to be that because the equipment and retailing markets are not highly concentrated, the merger is legal. If the "incipiency" rationale of Section 7 is to be implemented, this merger must be viewed as a violation of Section 7. *Brown Shoe,* supra, 370 U.S. at 317–318, 82 S.Ct. 1502, 8 L.Ed.2d 510. Even if one looks at the statistics for 1966, in which Ritter had 18.1% of the dental equipment market and Patterson had 6.5% of the retail market, the conclusion would be the same.

As to the dental sundries submarket, the facts are quite different. Again, using 1964, the merger united the manufacturer of 4.3% of the dental sundries with the retailer of approximately 7.5% of the sundries market. All the record reveals on concentration at the manufacturing level is that four or five companies have relatively complete sundry lines and a good portion of the market. Yet, hundreds of companies compete with these leaders, and new companies find entry relatively easy. Basically, the government has not carried its burden of proof on this aspect of the case.

The dental products market presents a difficult question. Here Sybron accounted for approximately 9.2% of all sales in 1964, and Patterson sold 8% of all dental products. Proof relating to concentration in the dental products market at the manufacturing level is vague. However, this is a question of degree. I am persuaded that in light of the realities of absolute foreclosure competition in the dental products market would not be substantially lessened by this merger.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and subject matter.

2. Venue is proper in this judicial district.

3. The following are lines of commerce within the meaning of Section 7 of the Clayton Act:

(a) Dental products

(b) Dental equipment

(c) Dental sundries

4. As to each of these lines of commerce, the United States as a whole is the appropriate section of the country within the meaning of Section 7 of the Clayton Act.

5. The effect of the merger of the Ritter Company, Inc. and M. F. Patterson Dental Supply Company may be substantially to lessen competition in the dental equipment market.

6. The merger of the Ritter Company, Inc. and the M. F. Patterson Dental Supply Company is in violation of Section 7 of the Clayton Act.