UNITED STATES of America, Plaintiff,

v.

HAMMERMILL PAPER COMPANY, Defendant.

Civ. A. No. 89–68 Erie.

United States District Court, W. D. Pennsylvania.

March 16, 1977.

Willie L. Hudgins, Jr., Richard E. La-Farge, Attys., Dept. of Justice, Antitrust Div., Washington, D. C., for plaintiff.

Mortimer E. Graham, Robert J. Kilgore, Erie, Pa., Howard Adler, Jr., and Donald L. Hardison, Washington, D. C., for defendant.

## OPINION

WEBER, Chief Judge.

> This is the forest primeval. The murmuring pines and the hemlocks,
> Bearded with moss, and in garments green, indistinct in the twilight,
> Stand like Druids of eld, with voices sad and prophetic,
> Stand like Harpers hoar, with beards that rest on their bosoms.
>
> Evangeline, H. W. Longfellow

"Well, essentially, Fraser's business is certainly quite a bit different than Hammermill's business. We are kind of a little Weyerhaeuser in that we have a vast number of trees and the trees sit in the forest growing and when they reach maturity they have to be cut, and there is a tremendous impetus to keep cutting the trees and keep running the machines because the trees keep growing and we have a difficult time generally keeping up with the cut. My guess is that Hammermill's tree position is considerably different than ours.

> Mr. Dolan, Fraser Paper Co.
> Testimony, Tr. 895.

## INTRODUCTION

This is an action brought by the United States under 15 U.S.C. § 25 which complains that Defendant Hammermill Paper Company (Hammermill) violated Section 7 of the Clayton Act (15 U.S.C. § 18) by its acquisition of the assets of Western Newspaper Union (WNU) and all of the capital stock of Carter Rice Storrs and Bement, Inc. (Carter Rice). The complaint prays for an order of divestiture, an injunction and such further relief as the court may deem appropriate.

Section 7 of the Clayton Act (15 U.S.C. § 18 provides:

> No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly.

## JURISDICTION AND VENUE

Hammermill is a corporation organized and existing under the laws of Pennsylvania, with its principal office in Erie, Pennsylvania and transacting business and being found within the Western District of Pennsylvania. At all times pertinent it has shipped and sold paper products in interstate commerce.

Western Newspaper Union was a Delaware corporation with its principal office in New York, N. Y., prior to the acquisition of its assets by Hammermill in 1961, and purchased and sold paper products which were shipped in interstate commerce.

Carter Rice Storrs and Bement, Inc., is a Massachusetts corporation with its principal office in Boston, Massachusetts, and at the time of the acquisition of its stock by Hammermill in 1966 it purchased and sold paper products which were shipped in interstate commerce.

## THE LINE OF COMMERCE

■ By agreement of the parties the line of commerce in this case within the meaning of Sec. 7 of the Clayton Act is the manufacture and sale of printing and fine paper for the purpose of measuring the effects of the acquisitions challenged in this litigation. The term "printing and fine paper" includes coated and uncoated book papers, coated and uncoated printing papers, offset papers, text and cover papers, sulphite bond papers, rag or cotton content papers, mimeograph and duplication papers, onionskin, ledger papers and bristols.

Printing and fine paper is principally sold by mills to book and magazine publishers, and by paper merchants to commercial printers and lithographers, communication centers, stationers, insurance companies, plants, institutions and schools having in-house printing and duplicating operations, and by mills to greeting card and envelope manufacturers and other converters.

In the context of this case Hammermill is a manufacturer or "supplying firm", and Western and Carter Rice are paper merchants or "purchasing firms".

## HAMMERMILL PAPER COMPANY

Hammermill was founded in 1898. It produces printing and fine papers at mills located in Oswego, New York; Lock Haven, Pennsylvania; Erie, Pennsylvania; Hamilton, Ohio; Watervliet, Michigan; West Springfield, Massachusetts; Turners Falls, Massachusetts; and Woronoco, Massachusetts. Hammermill is also a one-third owner of a printing and fine paper mill located in Hoquiam, Washington, and is responsible for selling its entire production.

Among the 20 leading manufacturers of printing and fine papers, Hammermill ranked sixth in total United States tonnage and share of the industry in 1967, its share being 4.98%.

In 1966 it ranked fifth with 5.07% of total United States shipments; in 1970 it ranked seventh with 4.29%, and in 1971 it ranked sixth with 4.4%.

However, in the line of fine paper or writing paper, including rag or cotton content papers, ledger papers, and sulphite bond papers, it is the world's largest producer, accounting for 9.5% of United States shipments in 1967.

Hammermill's share of the major segments of the printing and fine paper line for 1967 are:

| | |
|---|---|
| Uncoated book paper | 5.0% |
| Coated Paper | 2.6% |
| Fine paper | 9.5% |

## MARKET SHARES—SELLERS

The rank and market shares of the supplying firms in the printing and fine paper industry for a 12 year period does not reveal either high concentration or a trend to concentration.

In 1960, the highest market share was 8.54%, the highest 4 had a cumulative share of 28.03%, the highest 8 had 46.46%, and the highest 20 had 72.29%. Hammermill ranked 10th with a market share of 3.34%.

From 1961 through 1971 cumulative market shares of the highest 4, and highest 8, were as follows:

| | 1961 | 1962 | 1963 | 1964 | 1965 | 1966 |
|-------|------|------|------|------|------|------|
| Top 4 | 27.06% | 27.14% | 26.66% | 26.70% | 25.76% | 25.82% |

| | 1967 | 1968 | 1969 | 1970 | 1971 |
|-------|------|------|------|------|------|
| | 25.94% | 26.25% | 26.81% | 26.21% | 27.0% |

| | 1961 | 1962 | 1963 | 1964 | 1965 | 1966 |
|-------|------|------|------|------|------|------|
| Top 8 | 44.75% | 45.01% | 44.46% | 43.76% | 44.20% | 44.18% |

| | 1967 | 1968 | 1969 | 1970 | 1971 |
|-------|------|------|------|------|------|
| | 44.27% | 43.41% | 44.52% | 44.52% | 44.4% |

In 1971 the cumulative market share of the 20 largest firms was 74%. In that year Hammermill ranked sixth in market share.

The following table shows for 1967 the rank and share of the 20 leading manufacturers of printing and fine paper reporting to the statistical paper group:

| Rank | Manufacturer | Total Tonnage | Share of Industry | Cumulate Share of Total Reported |
|------|--------------|---------------|-------------------|-----------------------------------|
| 1 | International | 700,635 | 8.11% | |
| 2 | Mead | 545,941 | 6.33% | 14.44% |
| 3 | Champion | 536,891 | 6.22% | 20.66% |
| 4 | Kimberly-Clark | 456,172 | 5.28% | 25.94% |
| 5 | West Virginia | 436,042 | 5.05% | 30.99% |
| 6 | Hammermill | 430,095 | 4.98% | 35.97% |
| 7 | St. Regis | 362,330 | 4.22% | 40.19% |
| 8 | Oxford | 352,597 | 4.08% | 44.27% |
| 9 | Consolidated | 342,398 | 3.96% | 48.23% |
| 10 | Crown Zellerbach | 286,243 | 3.31% | 51.54% |
| 11. | Boise Cascade | 231,095 | 3.68% | 54.22% |
| 12 | Weyerhaeuser | 215,024 | 2.49% | 56.71% |
| 13 | Northwest | 214,824 | 2.49% | 59.50% |
| 14 | Nekoosa Edwards | 198,217 | 2.30% | 61.50% |
| 15 | S. D. Warren | 176,346 | 2.00% | 63.50% |
| 16 | Blandin | 175,383 | 1.98% | 65.48% |
| 17 | Fraser | 170,130 | 1.97% | 67.45% |
| 18 | Glatfelter | 136,147 | 1.58% | 69.03% |
| 19 | New York & Penn | 113,796 | 1.33% | 70.36% |
| 20 | Union Camp | 113,714 | 1.32% | 71.68% |

## DISTRIBUTION THROUGH PAPER MERCHANTS

Manufacturers use various methods of selling printing and fine paper, including wholesale paper merchants, wholesalers other than paper merchants, office and duplicating equipment supply houses, and direct sales to printers, publishers, farms, manufacturers, converters, and other users of paper.

The term "paper merchant" is used and accepted in the paper industry to describe a type of paper wholesaler who performs certain services to the manufacturers and users of printing and fine paper. They are not the ultimate consumers of paper, but

are middlemen providing services to both parties. The ultimate consumers of printing and fine paper are principally commercial printing and in-house printing plants.

The "paper merchant" provides services to manufacturers of printing and fine papers by warehousing large and varied inventories in local areas throughout the country, by providing a sales force to promote the sale of a manufacturer's product throughout the country, and providing advice and guidance to the manufacturer of the problems and needs of the users of the paper.

The paper merchant provides services to users of printing and fine papers by assuring them of immediate availability of a wide variety of papers, by supplying credit to the users of paper, by supplying a sales force to give samples, counselling in selection, technical assistance concerning the properties of various papers, cost computations, cutting and trimming paper to custom sizes, and by consultation on the problems of printers and other users.

There were 933 paper merchant outlets in the United States in 1967.

Hammermill sells about 70% of its production of printing and fine papers through paper merchants. At the end of World War II direct sales (other than through paper merchants) accounted for about 40% of total sales, but as of 1972 direct sales accounted for about 60% of tonnage and 55% dollar value total printing and fine paper sales in the total United States market.

Representative manufacturers sell their production of printing and fine papers directly or through paper merchants as follows:

| | Direct | via Paper Merchants |
|---|---|---|
| Hammermill Paper Company | 28-30% | 70-72% |
| West Virginia Pulp and Paper Co. | 100% | 0 |
| Lincoln Pulp and Paper Co. | 0 | 100% |
| Newton Falls Paper Co. | 100% | 0 |
| Oxford Paper Company | | |
| Total Production | 60% | 40% |
| Magazine paper | 90% | 10% |
| Commercial print | 0 | 100% |
| Penntech Corporation | 75% | 25% |
| Fraser Paper Company | 78% | 22% |
| Union Camp Corporation | | |
| Total Production | 70% | 30% |
| Commercial print | 0 | 100% |
| Nekoosa Edwards Paper Co. | 50% | 50% |
| Millers Falls Paper Co. | 50% | 50% |
| Rising Paper Co. | 50% | 50% |
| Pollack Forests, Inc. | 25% | 75% |
| Georgia-Pacific Corp. Hopper Div. | 10% | 90% |

Brown Co.
 Eagle A Division

| | <u>Direct</u> | <u>via Paper Merchants</u> |
|---|---|---|
| | 20% | .80% |

## WESTERN NEWSPAPER UNION

In 1961, WNU had three wholly-owned subsidiaries, Western Paper Company, Midwestern Paper Company, and E. C. Palmer Paper Company through which it operated paper merchant establishments in 19 cities and 13 states:

| Little Rock | Arkansas |
|---|---|
| Billings | Montana |
| Dallas | Texas |
| Houston | Texas |
| Des Moines | Iowa |
| Sioux City | Iowa |
| Fargo | North Dakota |
| Kansas City | Missouri |
| Omaha | Nebraska |
| Lincoln | Nebraska |
| Memphis | Tennessee |
| Miami | Florida |
| Tampa | Florida |
| New Orleans | Louisiana |
| Shreveport | Louisiana |
| Oklahoma City | Oklahoma |
| Tulsa | Oklahoma |
| Salt Lake City | Utah |
| Wichita | Kansas |

81% of WNU's sales in 1961 were of printing and fine paper.

In 1958, WNU accounted for 1.02% of total United States paper merchant sales of printing and fine paper.

## CARTER RICE STORRS and BEMENT, INC.

In 1966, Carter Rice had five wholly-owned subsidiaries; Bulkley Dutton Linde Lothrop Inc.; Stanford Paper Co.; Lehigh Valley Paper Corporation; Paper Merchants, Inc. and Baltimore-Warner Co. Inc. Carter Rice and its subsidiaries operated paper merchant establishments in 13 cities in 8 states and the District of Columbia:

| Baltimore | Maryland |
|---|---|
| New York | New York |
| East Hartford | Connecticut |
| New Haven | Connecticut |
| Pawtucket | Rhode Island |
| Boston | Massachusetts |
| Springfield | Massachusetts |
| Worcester | Massachusetts |
| Augusta | Maine |
| East Rutherford | New Jersey |
| Allentown | Pennsylvania |
| Philadelphia | Pennsylvania |
| Washington | District of Columbia |

88% of the sales of Carter Rice in 1967 were of printing and fine paper.

In 1967 Carter Rice and WNU accounted for 4.8% of the total United States paper merchant sales of printing and fine paper.

## THE SECTION OF THE COUNTRY

The parties have agreed that the nation as a whole is a relevant geographic market or in the words of the statute "section of the country" for the purposes of this case, and all of the evidence supports this conclusion.

The government argues, however, for a finding that the six New England States constitute a relevant submarket in this case because one of the acquired paper merchant firms, Carter Rice, is the largest paper merchant firm operating in the six New England States of Maine, Vermont, New Hampshire, Massachusetts, Connecticut and Rhode Island, having three outlets in Massachusetts, two in Connecticut, one in Maine and one in Rhode Island. Carter Rice accounted

for 31.9% of the total paper merchant sales of printing and fine paper in New England in 1967.

This is a vertical combination case and the issue is whether the effect on competition is to be measured with reference to the market in which the manufacturing and selling firms in the line of commerce compete or the market in which the products are purchased for consumption or resale.

In this case the area of effective competition for manufacturers of printing and fine paper includes the entire United States, with the possible exception with respect to some grades of paper of territory west of the Rockies, a factor not material here.

With respect to such manufacturers there is no freight rate barrier that isolates New England from the rest of the country and creates it as a separate marketing area. Paper manufacturers located in New England compete effectively in the Midwest against manufacturers with mills located there, and mills in the Midwest compete for sales in New England. Paper manufacturers in New England do not sell primarily in New England but sell throughout the United States. Paper manufacturers do not find it necessary to build mills in New England to participate in the New England trade. Hammermill has only one mill in the New England states which accounts for 10% of its total production, and supplies the great preponderance of its New England sales from mills outside New England. For some grades of printing and fine paper there is only one pricing zone throughout the United States; for other grades there is one pricing zone through the United States east of the Rockies. There is no separate delivered pricing zone for New England. The paper merchants in New England receive much of their stock from mills outside New England. Carter Rice outlets outside New England purchased from New England mills as much stock as the outlets within New England, while its New England outlets purchased the greater part of their requirements outside New England.

In *United States v. Kimberly-Clark Corp.*, 264 F.Supp. 439 [N.D.Cal.1967], the leading Clayton Act case dealing with the paper industry, the court held six western states to be a separate geographic submarket in the paper industry in which the anticompetitive effect of the acquisitions could be determined. After considering the 3 Pacific Coast states and the 11 state western market, the court chose a six state area in which the manufacturers operated and competed for consumers. The compelling reason for this finding was undoubtedly the fact that freight rates increased dramatically at Denver and precluded effective competition in the western United States by mills located east of the Rocky Mountains. The industry witnesses all testified that they recognized the western states as a separate market; the defendant companies tailored their operation to a separate western market; industry representatives testified that it was essential to have mills in the west to compete in the western market; the defendant manufacturer testified that it was necessary to have production facilities in the area to be able to compete in the western market; and the paper merchants in the area purchased the great preponderance of their supplies from mills located in the area.

None of these facts have been established in this case and in fact the government has admitted that the economic factors differentiating the Western market for paper products from the rest of the country have no application to the New England market contended for here.

The argument of the United States is that the principal users of printing and fine papers are printers who, because of their needs for quick delivery of a variety of lines of paper in varying quantities, must be closely tied to the local paper merchant outlets. Conversely, in order to serve his market, the paper merchant must establish outlets near his customers. The arguments that paper merchants in New England "cannot and do not compete with paper merchants located in other sections of the country" does not establish that New England is a separate section of the country for measuring the anticompetitive effect of

Hammermill's acquisition, because the same criteria apply to all paper merchants in any section of the country. The principal function of a paper merchant anywhere is to serve the local printing trade with a variety of lines, locally warehoused, and available for quick delivery in a large range of quantities.

We cannot find the facts establishing the close relationship between paper merchants and printers to be relevant to the question of the effect of this acquisition to lessen competition among manufacturers of printing and fine papers in the sale of their products to paper merchants.

The relevant market is not the area in which Hammermill's customer operated before the acquisition of the customer by the manufacturer, but the area in which Hammermill and its competitors operate and in which they compete for the available customers.

In *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 [1961], the question at issue was the validity of a vertical arrangement where an electrical utility company in Tampa, Florida, serving a sixty mile area contracted to buy all of its requirements of coal for its power generator from the defendant mining company. The maximum requirements of the utility company exceeded the total consumption of coal in peninsular Florida, but did not amount to more than 1% of the coal produced by all mining companies in the defendant mining company's producing area. In an action to enforce the contract defendant raised the defense of illegality of the contract under Section 3 of the Clayton Act. The Supreme Court, in considering the probable foreclosure of competition in a substantial share of the line of commerce affected, held that the relevant market in which to measure the effect of this agreement was not the Florida area where the coal is consumed, but the area in which the defendant and 700 other producers effectively compete. Because the Tampa contract covered less than 1% of their area's total production, the Court found it quite insubstantial. While Section 3 of the Clay-

ton Act does not use the language of Section 7 "in any section of the country", the Court relied upon and quoted *Tampa Electric* in a Section 7 case in *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 [1963], and in *United States v. Phillipsburg National Bank & Trust Co.*, 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 [1970].

The government cites *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 [1962], a Section 7 case. However, we find that *Brown Shoe* involved both vertical and horizontal mergers between Brown, a leading manufacturer, the third largest seller of shoes by dollar volume with over 1,230 owned or controlled retail outlets, and Kinney, a manufacturer and retailer with 350 retail stores, the eighth largest company by dollar volume of those engaged primarily in selling.

With respect to the vertical effect of this merger, the court found:

"[T]he relevant geographic market is the entire Nation. The relationships of product, value, bulk, weight and consumer demand enable manufacturers to distribute their shoes on a nationwide basis, as Brown and Kinney, in fact, do. The anticompetitive effects of the merger are to be measured within this range of distribution." (p. 328, 82 S.Ct. p. 1525)

However, examining the horizontal aspects of this merger at the retail level the Court found a relevant geographic market to be those cities of populations exceeding 10,000, with their environs, where both corporations retailed shoes through their own outlets, and where, by reason of the merger competition may be substantially lessened.

▮ We conclude that there is no identifiable submarket consisting of New England, in which the effect on competition in the sale of printing and fine papers by manufacturers, can be separately measured aside from its effect on competition in the nation as a whole.

Judge Zipoli in *Kimberly-Clark*, supra, refused to apply the *Tampa Electric* rule. His primary reason was set forth in 264 F.Supp. at p. 459, fn. 22, where he recites

that *Tampa Electric* was a case brought under Section 3 of the Clayton Act which expressly omits the phrase "any section of the country", and hence the precise language of Section 7 was never considered in that case. He also noted that the seller and all his competitors were located in the Appalachian coal area and, therefore, all coal coming from that area was the proper universe. However, as to paper manufacturers, he found mills to be located throughout the country, and that there were economic and industrial differentiations of regional markets. He found:

"The West is such a different market, one which, as this Court noted, is distinguished by freight rates, common economic and competitive factors, service and convenience advantages which adhere to regional producers, and industry recognition of the area as a separate market. These factors and the geographic differentiation which they demonstrate were not present in Tampa Electric which involved a unitary market devoid of such differentiation." (p. 459).

The striking element in *Kimberly-Clark* was the evidence that paper manufacturers could only sell in the Western market if they had mills there. *Kimberly-Clark* had two mills in that area and they acquired the paper merchant chain in that area to distribute the tonnage generated by their mills. We see no departure from the *Tampa Electric* rules under these facts.

## MARKET SHARES AS A FACTOR IN DETERMINING SUBSTANTIAL PROBABILITY OF FORECLOSURE

In 1958, WNU accounted for 1.02% of total United States paper merchant sales of printing and fine paper.

In 1966, Carter Rice accounted for 3.7% of total United States paper merchant sales of printing and fine paper.

In 1966, after Hammermill's acquisition of both companies, WNU and Carter Rice accounted for 4.6% of total United States paper merchant sales of printing and fine paper.

In 1969, WNU accounted for .8% and Carter Rice accounted for 3.29% for a combined total of 4.09% of total United States sales of printing and fine paper by paper merchants. With respect to the purchases of total mill products, both by paper merchants and direct sales, WNU accounted for .47% of all purchases and Carter Rice for 2.19%, or a combined total of 2.66% of total mill sales in 1969 of printing and fine paper in the United States.

The *Merger Guidelines* issued by the Antitrust Division of the Department of Justice on May 30, 1968, state that:

"In determining whether to challenge a vertical merger on the ground that it may significantly lessen existing or potential competition in the supplying firm's market, the Department attaches primary significance to (i) the market share of the supplying firm, (ii) the market share of the purchasing firm or firms, and (iii) the conditions of entry in the purchasing firm's market. Accordingly, the Department will ordinarily challenge a merger or series of mergers between a supplying firm, accounting for approximately 10% or more of the sales in its market, and one or more purchasing firms, accounting *in toto* for approximately 6% or more of the total purchases in that market, unless it clearly appears that there are no significant barriers to entry into the business of the purchasing firm or firms."

These Guidelines do not have the force of law and are not binding on the courts, but courts have paid them some deference:

". . . But because the Justice Department is obviously one of the principal government agencies charged with the duty of enforcing the antitrust laws, I think its position is entitled to some consideration, particularly when elements of the Guidelines find support in the developing case law. (See, e. g. *FTC v. Procter & Gamble Co.,* 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); *United States v. Continental Can Co.,* 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964);

*United States v. Penn-Olin Co.,* 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); *United States v. El Paso Natural Gas Co.,* 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); *General Foods Corp. v. FTC,* 386 F.2d 936 [3rd Cir. 1967]; *United States v. Wilson Sporting Goods Co.,* 288 F.Supp. 543 [N.D.Ill.1968]." *Allis-Chalmers Mfg. Co. v. White Consolidated Ind., Inc.,* 414 F.2d 506, 524 [3rd Cir. 1969].

Under *Brown Shoe,* supra, the starting point in analyzing a vertical arrangement is the size of the market share which may be foreclosed by the acquiring manufacturer (370 U.S. p. 328, 82 S.Ct. 1502), although this factor will seldom be determinative. Brown, the acquiring company was the 4th largest manufacturer of shoes in the country producing about 4% of the total national production. It acquired Kinney, the 12th largest manufacturer which accounted for .5% of national production. The District Court found this merger of Brown's and Kinney's manufacturing facilities was economically too insignificant to come within the prohibitions of the Clayton Act, and the government did not appeal this finding (p. 335, 82 S.Ct. 1502).

It was the merger of Brown's and Kinney's retail outlets that was contested, and which provided the basis for the finding that each city in which both maintained retail outlets was the relevant geographic market. Brown previously owned or controlled about 1200 retail outlets. Kinney operated the largest family style retail shoe chain in the country, with over 400 outlets, making them about 1.2% of dollar volume of all national retail sales. As a result of the merger Brown moved into second place in terms of retail stores directly owned. It placed under Brown's control almost 1600 outlets, or about 7.2% of the nation's retail "shoe stores" (separately operated shoe stores or separately leased shoe departments), and about 2.3% of the nation's total retail "shoe outlets" (where shoes are included in general merchandise). The result was that in 32 cities, the combined market share of women's shoes exceeded 20%; in 7 of these cities the combined share of wom-

en's shoes sold ranged from 33% to 57%. In 31 cities the combined share of childrens' shoes exceeded 20% and in 6 cities exceeded 40%; in 118 cities exceeded 40%; in 118 cities the combined share in one line of shoes exceeded 5%; and in 47 cities the combined share of all 3 lines exceeded 5%.

The court found the effect on competition to be measurable in cities with populations exceeding 10,000 and their environs in which both Brown and Kinney retailed shoes through their own outlets.

In *United States v. Kimberly-Clark Corporation,* 264 F.Supp. 439 [N.D.Cal.1967], Kimberly-Clark had three product lines: (1) printing and fine paper, (2) sanitary paper, (3) coarse paper, and a combination of (1) and (3). Kimberly-Clark was the fourth largest corporation in terms of sales, accounting for the following shares of the total United States market: 7.5% of printing and fine papers, 24% of sanitary papers. In particular lines within these broad product classifications, the paper merchant chain that it acquired, BMT, was a "dual house" which handled both lines of printing and fine papers and also lines of coarse or industrial papers. It served principally 6 western states from 34 outlets and was one of the largest chains of paper merchants in the area not owned by a paper mill. It bought 69% of its purchases from mills in the 6 western states and accounted for 15% of all paper merchant sales in the area.

The court determined that 6 western states properly formed a western market as a relevant "section of the country" in which the effects of the acquisition might be measured. This determination was based on the impact of freight rates, the advantage of service and convenience, common economic and competitive factors in the area, and industry recognition of the west as a separate market.

Other relevant market percentages disclosed in combination cases under Section 7 of the Clayton Act and their effect on competition have been noted in the following cases.

In *United States v. Sybron Corp.,* 329 F.Supp. 919, [E.D.Pa.1971], the court con-

cluded that where the manufacturer had 18.1% of the dental equipment submarket and the purchasing distributor had 6.5% of the retail market this, together with other factors of concentration in the industry, led to a conclusion that the merger may substantially lessen competition in the dental equipment submarket. However, as to the dental sundries submarket, the manufacturer of 4.3% of the dental sundries in the United States market combined with the retailer of 7.5% of the market was not sufficient to prove foreclosure of the market, considering other factors such as ease of entry into the market. Also in the dental products submarket the court found that a manufacturer with 9.2% of total sales and a retailer of 8% of total sales did not, in the light of realities of absolute foreclosure, prove a possibility of substantial lessening of competition.

Similarly, in *United Nuclear Corp. v. Combustion Engineering Corp., Inc.,* 302 F.Supp. 539 [E.D.Pa.1969], after finding a horizontal combination to be violative of Sec. 7, the court proceeded to consider the vertical aspects of the merger. This was a backward vertical integration, the acquisition of a supplier by a consumer, in the market of yellow cake, a uranium concentrate developed from crude uranium ore. The court found the yellow cake market a line of commerce of national scope. The purchasing firm bought 5½% of total national purchases; the supplying firm had 19% share of its market; the purchasing firm acquired the supplier. The court found these market share statistics insufficient to prove that the backward vertical merger would have anti-competitive effects, in view of the other elements considered. The court determined, after considering market share statistics: "But there is much more to the present case than mere arithmetic." (p. 554).

One fallacy of reliance on arithmetic was illustrated in *United Nuclear,* where the acquiring firm, the customer, accounted for 5½% of all commercial purchases, and the producer acquired accounts for 19% of all commercial sales. The acquisition of the producer by the customer could foreclose the producer only to the extent of the customer's needs.

In Hammermill, to foreclose competition in sales to its acquired paper merchants, WNU and Carter Rice, Hammermill would have to devote substantially all of its production to these two companies. In 1969, Hammermill's total sales to paper merchant houses was $91,812,174, whereas WNU's and Carter Rice's combined purchases of printing and fine paper were $81,095,754.

Also, in this case, Hammermill already had a substantial pre-existing supply position with WNU and Carter Rice. The evidence was that this relationship was likely to continue. Prior to the acquisitions, Hammermill accounted for 40% to 50% of WNU's total purchases and 10% to 15% of Carter Rice's. Thus, the market share represented by Hammermill's previous supply to WNU and Carter Rice is not subject to foreclosure.

### The extent of divestiture required in the *Meade* and *Champion* cases.

While a consent decree may be of weak precedential value it represents an informed determination of the Department of Justice which is a principal agency charged with the enforcement of the antitrust laws. Its position is entitled to some consideration in the same manner as consideration is given to its Guidelines. See citation of *Allis-Chalmers v. White Consolidated Industries, Inc.* at pp. 1280–1281 above.

In a consent decree in *United States v. Champion Papers, Inc.,* (Civil Action No. 022708, D.Neb.1965), Champion which owned merchant paper houses having total sales of $145,173,852 in 1967 was allowed to retain, after the divestiture, merchant paper houses having printing and fine paper sales of approximately $100,000,000.

In a consent decree in *United States v. The Meade Corporation,* (Civil Action No. 3576, S.D.Ohio 1968), the *Mead Corporation* owned paper merchant houses in whole or in part having printing and fine paper sales in 1968, of $181,440,480 and wholly owned houses having printing sales of $135,948,-

000. After divestiture *Mead* would be allowed to retain paper merchant houses, in whole or in part, which in 1968 had printing and fine paper sales of $128,712,333 and wholly owned houses having printing and fine paper sales of $113,201,000.

The total sales of the paper merchant houses that *Champion* and *Mead* were allowed to retain were considerably ,higher.

As a consequence of these settlements, two leading paper mills, each with an aggressive history of acquisition of paper merchant houses, were each permitted to retain paper merchant houses with printing and fine paper sales in excess of the total sales of Western and Carter Rice combined.

This consent decree provides the Court with some informed judgment on the size of a particular market that is not deemed a threat to competition by the possibility of foreclosure.

## MARKET SHARES NOT SUBJECT TO FORECLOSURE

(a) Pre-acquisition Volume of Sales.

Hammermill had been a supplier of both WNU and Carter Rice since 1912. Supplier and distributor relationships in the printing and fine paper industry are stable and long lasting. There is no evidence to show that sales by Hammermill to these two paper merchants would have been lost had they continued in business as independent paper merchants.

 Hammermill had supplied about 45% of the printing and fine paper requirements of WNU and about 10 to 15% of those of Carter Rice before the acquisition of these firms by Hammermill. The stable pre-acquisition business relationship between the supplier and the purchasers removes from the area of potential foreclosure that share of the market already occupied. This factor was recognized in *United States v. International Tel. & Tel. Corp.* (Canteen), 1971 Trade Cases, 90,530 at p. 90,559:

"Even were Canteen to provide food service to all of the ITT locations which it does not presently serve, the share of the market which would be foreclosed to

competing food service suppliers would be *de minimus* under the foregoing authorities . . . .. After subtracting these locations already served by Canteen, the Government's economist estimated that the remaining ITT locations with 250 or more employees represented 0.48% of all such industrial locations in the United States and only 0.34% of the total employment at such locations."

(b) Government Contract Business.

Carter Rice, in its New York and Washington, D. C. locations conducts a brokerage service, whereby it assists paper manufacturers, including Hammermill, in bidding on government contract business. In this operation Carter Rice provides none of the usual paper merchant functions, such as sales promotion, warehousing or extension of credit. Many paper merchants perform the function for paper mills, but some paper mills perform this function for themselves. They have no control over the government's purchasing, they merely submit bids in competition with other paper merchants representing mills and paper mills bidding directly, and the government award is made to the lowest bidder. The bids are made on a public basis and any attempt by Carter Rice to favor Hammermill would be known to the other paper mills interested and Carter Rice's function in this line of business would be destroyed. Carter Rice has represented some 25 or 30 separate mills which have submitted bids through it for government purchases. To maintain this function on a profitable basis Carter Rice must be able to submit bids for a large number of mills.

In 1969 sales for government contracts represented $17,000,000 of its total sales or approximately .7% of the total United States merchant sales.

The government's response to this evidence is that Carter Rice's position is still anticompetitive, that other mills continue to use Carter Rice's government bidding services because they need the services and expertise of Carter Rice and because they may be bidding on types of paper that

Hammermill does not supply or does not wish to bid on, although Hammermill is one of the fullest line producers of printing and fine paper in the country.

For 1969, Carter Rice's total sales of printing and fine paper amount to 3.29% of all paper merchant sales of printing and fine paper. Of this total, .72% were sales on government contracts.

Accepting the argument that it is anti-competitive to have Hammermill as the owner of the house that supplies the service for other paper mills, the evidence is offered and received as an indication that the share of the market represented by the total printing and fine paper sales of WNU and Carter Rice is not the true reflection of the share of the market subject to foreclosure by the acquisition, it must be discounted to reflect these factors.

(c) Product Lines Not Manufactured by Hammermill.

A final reflection on the statistics of WNU and Carter Rice total sales as a measure of the market subject to foreclosure is the evidence produced as to the capacity of Hammermill to manufacture and supply all the products that a paper merchant must carry, including those that Hammermill does not manufacture and those "specification" items which customers order by brand names.

Hammermill does not supply certain lines that are carried by paper merchants such as groundwood papers, no-carbon required papers, tag, and only a limited supply of coated and converting grades, recycled paper and lightweight papers. The government agreed that Hammermill could not supply all these lines but insists that the bulk of the paper merchant's business is in the standard grades which Hammermill could supply and Hammermill has been shown to supply 40–50% of WNU's total purchases. Nevertheless, WNU's sales in 1969 amounted to .8% of total U.S. paper merchant sales of printing and fine papers, and of this .14% was accounted for by sales of printing and fine paper products not made by Hammermill. Of the combined sales of printing and

fine paper in 1969 by WNU and Carter Rice, 4.09% of the U.S. total sales, 1.09% is accounted for by sales of products not made by Hammermill.

Western's and Carter Rice's respective 1969 purchases accounted for .47% and 2.19% for a total of 2.66% of U.S. paper mill sales of printing and fine paper, both direct and paper merchant sales.

The government argues the unreliability of the estimates produced by Hammermill because they are derived from total purchases. The government argues that actual sales records supplied for 1967 would show that WNU and Carter Rice accounted for 4.8% of total paper merchant sales in that year. We do not find the fractional difference in statistics for two different years significant.

(d) Other Avenues of Sales.

The acquisition of paper merchant outlets for the sale of printing and fine paper presents a possibility of foreclosure to manufacturers only to the extent that they distribute through such outlets. Thus the market share subject to possible foreclosure should be measured by the total sales of paper manufacturers. While WNU's and Carter Rice's share amounted to 4.09% (or 4.8%) of the total sales of printing and fine paper by paper merchants, their combined share of purchases in the total United States production of printing and fine paper accounted for 2.66% in 1969.

The decline in the purchases of printing and fine papers by paper merchants is attributable to the development of new lines of printing and fine papers for use by business houses with their own in-house printing and duplicating facilities. These include business forms and computer printout papers. Business machine houses, such as A. B. Dick and Xerox, are substantial consumers of these lines of papers, which are sold on a direct basis.

There has been an increase in direct selling by paper manufacturers. On the other hand, there is a decline in paper merchant sales as a proportion of total sales of printing and fine paper. The total Hammermill

sales of printing and fine paper to paper merchants decreased in tonnage from 88% in 1960 to 70.7% in 1968, and in dollar value from 85.7% to 73.2% in those years.

(e) The Business Factors Precluding Foreclosure.

We have noted elsewhere Hammermill's profitable results in operating WNU and Carter Rice as independent separate profit centers. Any attempt to force Hammermill lines on them would destroy the value of these assets. As paper merchants they must offer a wide variety of types, grades, lines, colors and finishes that no single manufacturer can supply. The overwhelming weight of the testimony of industry witnesses, manufacturers, paper merchants and printers concurred in testimony to this effect.

A side effect of any such attempt to force its line exclusively on WNU and Carter Rice would be the loss of experienced salesmen.

Because Hammermill depends upon paper merchant distribution most heavily in its sales program, to a greater extent than most other manufacturers, it must conduct its business in a manner so as to continue its good relations with the other independent paper merchants which account for about 84% of its total distribution. It was necessary for Hammermill to demonstrate to them that they were being treated the same as the Hammermill owned houses, and their testimony recognized this fact where objective and commercial factors would make it self-defeating for a supplier to foreclose competitors from its owned outlet. "The traditional assumptions concerning foreclosure are not, as such, applicable." *United States v. Sybron Corp., supra,* 329 F.Supp. at 930.

## EASE OF ENTRY INTO THE PAPER MERCHANT BUSINESS

Hammermill's acquisition of these paper merchant chains is challenged on the grounds of its anticompetitive effect because of the probability of foreclosure of access by manufacturers to distribution through paper merchants.

That this is highly improbable is most evident from the evidence of ease of entry into the paper merchant business. Entry barriers are low. All that is needed is a truck, a warehouse, a salesman, and inventory. No major capital investment is required; in fact the only capital investment needed would be for inventory because the truck and warehouse could be rented. While the government asserts that the amount required to open a new paper merchant house or establish a new branch house might run as high as $200,000, defendant's evidence shows that a new or branch house with substantial sales volume can be established for substantially lower figures. (Omaha Paper Co., founded in 1964 for $100,000, sales volume 1972, $1,400,000; Reis Paper Company, Albany, New York branch, established for $150,000, sales volume in 1972, $750,000). Whichever figure is chosen, this is not a significant sum. It would not be difficult for an established paper merchant to raise funds to open a new branch, nor for a new entrant. It presents a constant opportunity for experienced salesmen of existing houses, and this very opportunity presents a deterrent to Hammermill to prevent it from restricting its paper merchant houses to its own lines. The salesman would go elsewhere to a house with more lines available, or set up his own house.

Abundant testimony has established that experienced salesmen are available to newly-opened merchant paper houses or branches, particularly where they have the lines of more manufacturers available to them.

Ease of entry into the paper merchant business is illustrated by evidence showing that the number of paper merchant outlets in the United States increased from 882 to 933 during the period 1963–1967. There was abundant testimony showing the opening of new branch outlets by existing paper merchants during the relevant period.

Therefore, any attempt by Hammermill to foreclose access by competitors to its

paper merchant outlets would produce the reaction of increasing the number of paper merchant outlets, either newly established firms or new branches, and increasing the experienced sales staff available to them. More outlets would be available to competing manufacturers.

The importance of the factor of ease of entry in the purchasing firm's market in vertical acquisitions is recognized by the Department of Justice in its *Merger Guidelines*, § 12, where the market shares of the acquired purchasing firm are not deemed to be critical in restricting competition where "it clearly appears that there are no significant barriers to entry into the business of the purchasing firm or firms."

## THE DECLINING IMPORTANCE OF PAPER MERCHANTS IN DISTRIBUTION

For 1970 total United States direct sales of printing and fine papers by manufacturers amounted to 59.8% by tonnage and 55% by dollar value, and sales through paper merchants amounted to 40.2% in tonnage and 45% in dollar value. This is a reversal of the prior ratio in which direct sales accounted for about 40% of total sales. While total United States paper merchant sales increased in dollar volume from $1,472,829,000 in 1960 to $2,370,755,000 in 1969, representing a 60% increase in dollar amount over a ten year period, it must be discounted for the inflation prevalent during this period when the Consumer Price Index rose from 103.1 in 1960 to 127.7 in 1969, an increase of 24%.

While the dollar volume of total paper merchant sales increased, the total United States production of printing, writing and related paper (excluding newsprint) increased from 7,157,234 short tons in 1961 to 11,246,212 short tons in 1969, an increase of 57%.

From all these factors and from the testimony produced we conclude that distribution of printing and fine papers through paper merchants is a declining situation in the industry, to a point where direct selling is the dominant pattern in the industry.

## EASE OF ENTRY AT MANUFACTURING LEVEL

The capital cost of building a complete new paper mill is high, but new firms do enter the printing and fine paper line and existing paper firms convert their facilities to enter this line. Because they already have access to pulp wood supplies and have the basic pulp and paper making facilities, their conversion to this line is relatively easy. Manufacturers of kraft paper such as Nekoosa-Edwards and Union Camp Corporation have entered this line. Others have entered the printing and fine paper industry by the purchase of small mills, converting them to printing and fine paper, and building new mills. Defunct and inactive mills have been purchased and converted to printing and fine paper production. They have all had access to distribution through paper merchants and have not been affected by Hammermill's acquisition of WNU and Carter Rice.

A substantial element of new entry into the industry has been the growth of utility or commodity grades of printing and fine paper. These are cheaper, unwatermarked grades that are not readily identifiable with any manufacturer and are subject to intense price competition. The greatly increased demand for these grades has induced many large producers to enter this field because successful marketing does not depend upon prior established markets. These are papers to supply users of offset printing, reproduction facilities, copiers, office machines and the like. Many large paper firms equipped with large, high speed equipment and large holdings of timber have converted to this production and entered the printing and fine paper field, providing strong competition in the field of utility and commodity papers. Hammermill is not in a strong position in this field because of lack of equipment adaptable to this production, lack of large low cost timber reserves, and its concentration on a large variety of specialized papers.

## THE NATURE AND PURPOSE OF THE ARRANGEMENT·

The Supreme Court has directed the courts to examine the nature and purpose of the arrangement:

"Between these extremes, in cases such as the one before us, in which the foreclosure is neither of monopoly nor *de minimis* proportions, the percentage of the market foreclosed by the vertical arrangement cannot itself be decisive. In such cases, it becomes necessary to undertake an examination of various economic and historical factors in order to determine whether the arrangement under review is of the type Congress sought to proscribe. A most important such factor to examine is the very nature and purpose of the arrangement.[48] Congress not only indi-

[48] Although it is "unnecessary for the Government to speculate as to what is in the 'back of the minds' of those who promote a merger," H.R.Rep. No. 1191, 81st Cong., 1st Sess. 8, evidence indicating the purpose of the merging parties, where available, is an aid in predicting the probable future conduct of the parties and thus the probable effect of the merger. *Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518; *United States v. Maryland & Virginia Milk Producers Assn.*, 167 F.Supp. 799, 804 [D.C.D. C.], aff'd 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880.

cated that 'the tests of illegality [under § 7] are intended to be similar to those which the courts have applied in interpreting the same language as used in other sections of the Clayton Act,' but also chose for § 7 language virtually identical to that of § 3 of the Clayton Act, 15 U.S.C. § 14, which had been interpreted by this Court to require an examination of the interdependence of the market share foreclosed by, and the economic purpose of, the vertical arrangement." *Brown Shoe Co. v. United States*, 370 U.S. 294, at p. 329, 82 S.Ct. 1502, at p. 1526, 8 L.Ed.2d 510 (1962)

In *Brown* the Court found a specific intent to foreclose. Brown was the fourth largest manufacturer with sales of about 25,000,000 pairs of shoes, and Kinney owned the largest independent chain of family shoe stores with 350 outlets and sales of about 8,000,000 pairs.

"Thus, in this industry, no merger between a manufacturer and an independent retailer could involve a larger potential market foreclosure. Moreover, it is apparent both from past behavior of Brown and from the testimony of Brown's President, that Brown would use its ownership of Kinney to force Brown shoes into Kinney stores. Thus, in operation this vertical arrangement would be quite analogous to one involving a tying clause." (pp. 331–332, 82 S.Ct. p. 1527) Kinney stores had not previously sold Brown shoes.

In *United States v. Kimberly-Clark*, 264 F.Supp. 439 [N.D.Cal.1967], the manufacturer was the fourth largest manufacturer of paper and paper products in the United States, selling 7½% of the national market of printing and fine papers, the world's largest producer of sanitary paper products selling 24% of total national shipments, selling 23.7% of the total market of tissue paper, and 5.6% of the total market of special industrial paper. The paper merchant chain was the largest independent chain in its market, operating 34 outlets in as many cities, and accounting for 15% of all paper merchant sales in that area. Kimberly Clark had also acquired nine paper merchant or converter firms during the period from 1951 through 1962. In addition to these findings the court rejected the defendant's argument that the acquisition was for the purpose of investment by finding that it would benefit K–C to acquire the outlet to secure the tonnage necessary for the programmed expansion of its west coast manufacturing facilities. (pp. 445, 447, 448).

The post-acquisition evidence showing the probability of foreclosure was that Kimberly Clark no longer operated the acquired paper merchant as an autonomous unit, it became a division of Kimberly Clark which put its own personnel in charge of operations, it added more of its own lines to the paper merchant's stock and greatly increased its sales of all lines to the acquired

house. In the terms of *Brown Shoe*, this is analogous to a tying contract:

> "The usual tying contract forces the customer to take a product or brand he does not necessarily want in order to secure one which he does desire. Because such an arrangement is inherently anticompetitive, we have held that its use by an established company is likely 'substantially to lessen competition' although only a relatively small amount of commerce is affected. *International Salt Co. v. United States, supra* [332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20]. Thus unless the tying device is employed by a small company in an attempt to break into a market, cf. *Harley-Davidson Motor Co.*, 50 F.T.C. 1047, 1066, the use of a tying device can rarely be harmonized with the strictures of the antitrust laws, which are intended primarily to preserve and stimulate competition." (footnotes omitted). 370 U.S. at 330, 82 S.Ct. at 1526–1527.

On the other hand the Court adopted a different rule for those arrangements analogous to requirement contracts:

> "On the other hand, requirement contracts are frequently negotiated at the behest of the customer who has chosen the particular supplier and his product on the basis of competitive merit. See, e. g., *Tampa Electric Co. v. Nashville Coal Co., supra* [365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580]. Of course, the fact that requirement contracts are not inherently anticompetitive will not save a particular agreement if, in fact, it is likely 'substantially to lessen competition, or to tend to create a monopoly.' . . . Yet a requirement contract may escape censure if only a small share of the market is involved, if the purpose of the agreement is to insure to the customer a sufficient supply of a commodity vital to the customer's trade or to insure the supplier a market for his output and if there is no trend toward concentration in the industry. *Tampa Electric Co. v. Nashville Coal Co., supra.* Similar considerations are pertinent to a judgment under § 7 of the Act." p. 330, 82 S.Ct. p. 1527.

Applying the *Brown* criteria in *United Nuclear Corp. v. Combustion Engineering, Inc., supra*, the Court found that the acquisition of a supplier by a customer was analogous to a requirement contract and would foreclose the supplier as a source of supply only to the extent of the customers' needs. In a situation where the supplier provided 19% of the market production and the purchaser accounted for 5½% of the market consumption the Court found these neither monopolistic nor *de minimus*, and applying the requirement contract standard, found that the burden of proof had not been met that a substantial lessening of competition was likely.

In the absence of any evidence of a specific intent or purpose to foreclose access by other paper mills to Western and Carter Rice, either viewed in the light of the motive for the acquisition or the post-acquisition history, we view the Hammermill acquisition of Western and Carter Rice in the nature of a requirement contract, in which all the factors tending to show the probability of foreclosure must be examined.

■ The government argues that lack of anticompetitive intent is irrelevant in a Section 7 case, but in *Brown Shoe* the Court found evidence of an intent to foreclose relevant in reaching its determination that the stringent *per se* rule of tying arrangements should be applied. The lack of evidence of intent to foreclose in the instant case is material. A good motive will not justify a merger once it has been shown to be substantially anticompetitive. *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 [1957]; *United States v. Pennzoil Co.*, 252 F.Supp. 962 [W.D.Pa.1965]. But "knowledge of intent may help the court to interpret facts and predict consequences." *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 [1918].

The pre-acquisition evidence of Hammermill's intent is voluminous if not enlightening. The government does not contest that Hammermill was not attempting to seek outlets for new production facilities, or that it was attempting to gain access to markets

served by the acquired paper merchant houses, or seeking additional distribution in their territories. There is no contention that Hammermill was attempting to foreclose competing suppliers from access to the acquired paper merchant outlets.

Hammermill's motives may be characterized as defensive, to preserve a distribution system to which it had been strongly committed, that of independent paper merchant houses. While it had a corporate policy not to acquire paper merchant houses, it acquired Western and Carter Rice when it faced the possibility that those firms might be sold or liquidated under conditions that they would not continue to function as traditional paper merchant houses in the distribution of Hammermill's products. There is no evidence that Hammermill's distribution through Western and Carter Rice would have been lost had those firms continued as viable independent paper merchant outlets.

While in a broad statement in Kimberly-Clark, supra, p. 462, Judge Zirpoli stated:

". . . It makes little difference whether the purpose of the acquisition is to protect existing distribution, as in the case of Hammermill and Nekoosa-Edwards, or to acquire distribution, as was K–C's acquisition of BMT. In either case the acquisition seeks and obtains for the acquiring mill the power to control significant channels of distribution and violated amended Section 7 'whether or not actual restraints or monopolies, or the substantial lessening of competition, have occurred or are intended.' *United States v. E. I. du Pont de Nemours, supra*, 353 U.S. at 589, 77 S.Ct. at 875, 1 L.Ed.2d 1057. 'The Government's burden is not to show that competition will be lessened by the acquisition, but only that it may tend to be lessened.' *United States v. Pennzoil Co.*, 252 F.Supp. 962, 977–978 (W.D.Pa.1965)."

Of course, Judge Zirpoli was not determining that Hammermill's acquisition of Western would tend to lessen competition, and the remark is *dictum* to that extent. He referred to the testimony of Mr. Franzen of Hammermill in the *Kimberly-Clark* trial who expressed fear that acquisition of Western by a competitor would place this distribution out of its control. Mr. Franzen also testified at the trial of the present case and stated that the same concern would be felt in any change of ownership of an established independent paper merchant with which a sales or marketing representation had built up a stable business relationship over the years.

We believe that the defensive nature of the acquisition must be viewed together with all of the evidence of motivation, to the extent that motivation for an acquisition is a relevant Section 7 criterion. See *United States v. Sybron Corporation*, 329 F.Supp. 919 [E.D.Pa.1971].

## THE POST–ACQUISITION EVIDENCE

(a) The effect of separate profit center operation.

In *United States v. White Consolidated Industries*, 323 F.Supp. 1397 [N.D.Ohio, 1971] the court examined the post-acquisition evidence to determine the validity of defendant's claim of separate profit center operation of the acquired outlet and rejected it on the evidence that "since entering into the agreement to merge, White Consolidated has been pursuing an intensified sales program at White Motors, with the clear purpose of taking full advantage of the impending merger between the two firms." (p. 1399). "The evidence and testimony presented to this Court . . . indicates a much firmer and more centralized control than the defendants would have us believe; and it would appear that it is the overall corporate profits, not divisional ones, which are of paramount importance to White Consolidated's central office." (p. 1399).

The separate profit center operation in *United States v. International Telephone and Telegraph* (Canteen) cit. supra, was given consideration:

"The evidence showed . . . foreclosure is unlikely to result from the merger. As previously indicated . . . ITT gives no preference to affiliated

units in the purchase of products and services. On the contrary, one profit center will purchase from another only where it is offered the best price, quantity and service." (p. 90,599)

Similarly, in *United States v. International Telephone and Telegraph Corp.*, 324 F.Supp. 19 [D.Conn.1970], (Grinnell) the court noted;

"The 'profit center' concept around which ITT is organized is not conducive to vertical foreclosure.", (pp. 39, 40)

and concluded that this mode of organization effectively eliminated any probability that ITT's theoretical power to foreclose would be exercised.

(b) The evidence of separate profit center operation by Hammermill.

Since 1956, when Hammermill acquired Watervliet Paper Company, its policy has been to operate newly-acquired units as separate profit center operations. Under this system each profit center manager is responsible for producing a profit with the assets under his control. No artificial barriers are erected which would distort this record of performance. This pattern has been followed at WNU and Carter Rice. The former management and key personnel were retained, with authority to hire and fire branch managers and other employees, to develop future management, and to see that the necessary products were available in his market to make each branch successful. Each branch manager is compensated on the basis of the profitability of his operation. Purchasing decisions are made at the merchant level rather than at the mill level and Hammermill salesmen call upon them in the same way that they call upon independent merchants. This testimony is unrebutted except for the argument that it is irrelevant because Hammermill retains the power to foreclose and that it is difficult to believe that Hammermill would not avail itself of the opportunity to increase its profits and the profits of its paper merchant houses by favoring certain Hammermill lines. It is argued that there is no evidence to show that Hammermill will not so act in the future, despite its present policies.

Despite the fact that Hammermill has the power to control the purchases of WNU and Carter Rice and foreclose sales of other producers to them, the probability of such action is remote because of the economic factors shown by the evidence.

WNU and Carter Rice, operated as autonomous units, are very profitable operations for Hammermill and represented a steadily increasing percentage of Hammermill's total profits. While their percentage of total Hammermill sales has remained steady for 1969, 1970 and 1971, they represent an increasing share of total profits for these three years, 11%, 16% and 23%. A substantial share of this profit is derived from the sale of products of other manufacturers by WNU and Carter Rice.

To limit WNU and Carter Rice to Hammermill products would destroy the effectiveness of WNU and Carter Rice as paper merchants because printers and specification buyers would not turn to them for the many services which paper merchants supply.

Salesmen, who depend upon commissions, and enjoy commissions on a large number of competitive lines handled by a paper merchant, would be restricted and would seek employment with a house not tied to a single manufacturer's line.

Hammermill could not supply all the lines of printing and fine paper required by an aggressive paper merchant, as well as the other paper products stock and sold by merchants. No single mill makes all of the printing and fine paper required to maintain an efficient paper merchant house.

Since the acquisition of Western by Hammermill in 1960, sales to Western by Hammermill increased by 65% in 1966 and by 66% in 1968 over those of the year prior to acquisition. Since the acquisition of Carter Rice in 1966, Hammermill sales to it increased 15% by 1967, 18% by 1968, and 14% by 1969 over the year prior to acquisition.

However, Western's purchases from all major suppliers has been increasing at the same time. Western's total purchases of printing and fine papers from all suppliers

was $7,011,587 in 1960, $10,815,807 in 1966, and $12,192,969 in 1969, the shares of Hammermill and other major suppliers in those respective years remaining relatively constant; 60.3%/39.7%, 58.5%/41.5% and 61.4%/38.6%. Of course, this increase in dollar amount of purchases and sales must be discounted to reflect the inflationary growth in the price index of 24% for this period.

From 1965 to 1969 Carter Rice's total purchases of printing and fine paper rose from $54,487,630 to $68,902,785. Hammermill's share of Carter Rice's total purchases rose from 15.3% in 1965 to 17.3% in 1969.

At the same time that Western's and Carter Rice's total purchases from Hammermill were rising Hammermill's total sales, both measured in dollars and tonnage were rising, as well as its total sales to paper merchants.

In 1960 Hammermill's total sales of printing and fine paper were 175,073 tons, in the dollar amount of $65,449,973. Of this, 154,-033 tons or $56,076,392 in dollar amount were sold to paper merchants, or 88% of tonnage. By 1965, sales were 345,283 tons, or $129,023,806, of which 243,780 tons or $91,509,257 were sold to paper merchants, or 70% tonnage, and in 1966, a peak year for this period total sales were 395,711 tons, or $142,531,401 of which 259,387 tons or $99,419,475 were sold to paper merchants, or 65.5% of tonnage.

Therefore, while Hammermill experienced a share increase in the purchases of Western and Carter Rice, its sales to all customers increased at the same time, while the relative importance of the paper merchant in the scheme of distribution declined. In major segments of the printing and fine paper line Hammermill demonstrated substantial growth in the decade 1958–1967 in the uncoated, book paper line, from 17,562 tons to a peak of 124,558 tons, and from 1.1% to 5.3% of the total United States share. In the fine paper line it rose from 83,221 tons or 5.9% of the market share to 2,553,000 tons or 9.1% of the market share. On the other hand, in coated papers its growth was limited from 1959 through 1964, but increased substantially thereafter, although only accounting for 3.1% of the national share in the peak year 1966. Its market share position among the leading manufacturers remained relatively constant.

From the mass of statistical evidence presented we find that the increase of sales by Hammermill to Western and Carter Rice during the post-acquisition was consistent with its sales history with these houses prior to the acquisition, that the increase in its sales to Western and Carter Rice was consistent with increase in sales to comparable non-owned paper merchant houses, that the increase in purchases by Western and Carter Rice from Hammermill is not disproportionate to the overall increases in their purchases, that several of Hammermill's leading competitors have increased their sales to Western and Carter Rice at a greater rate than that of Hammermill, and that Hammermill was no more successful in selling new lines and grades to Western and Carter Rice than to non-owned paper merchants.

## THE TREND TOWARD VERTICAL INTEGRATION IN THE INDUSTRY

The government has stressed the evidence of a trend to vertical integration in the industry where a number of the manufacturers have acquired paper merchant houses. From 1956 to 1966 nine manufacturers of printing and fine paper acquired 33 individual paper merchants, five major printing and fine paper manufacturers, Mead, Champion, Kimberly-Clark, Hammermill and Nekoosa-Edwards account for twenty-five of these acquisitions, including the two acquisitions by Hammermill involved in this case. The government admits that the trend slowed down in the late 1960's and attributed that to government action beginning with *United States v. Kimberly-Clark Corp., supra*, which produced a divestiture order. Government action was brought in *United States v. Champion Papers*, [Civil Action No. 22708, D.Nebr. 1965] and in *United States v. The Mead Corporation*, [Civil Action No. 3576, S.D. Ohio 1968], both of which resulted in con-

sent decrees involving a partial divestiture. From 1966 through 1972, three mills acquired six paper merchant houses. The trend was also ended, in considerable measure, by changing business conditions in the paper merchant industry.

Of the 33 acquisitions from 1956 to 1966, 16 were by *Mead Corporation,* and 4 were by *Champion Papers, Inc.,* which were the subject matter of the consent decrees cited above.

*Brown Shoe, supra,* considers the impact of trends in a Section 7 case in the following language:

"Another important factor to consider is the trend toward concentration in the industry. It is true, of course, that the statute prohibits a given merger only if the effect of *that* merger may be substantially to lessen competition. But the very wording of § 7 requires a prognosis of the probable *future* effect of the merger.

The existence of a trend toward vertical integration, which the District Court found, is well substantiated by the record. Moreover, the court found a tendency of the acquiring manufacturers to become increasingly important sources of supply for their acquired outlets. The necessary corollary of these trends is the foreclosure of independent manufacturers from markets otherwise open to them. And because these trends are not the product of accident but are rather the result of deliberate policies of Brown and other leading shoe manufacturers, account must be taken of these facts in order to predict the probable future consequences of this merger. It is against this background of continuing concentration that the present merger must be viewed." (emphasis by the Court). 370 U.S. pp. 332, 333, 82 S.Ct. p. 1527, 1528.

■ Also, in *United Nuclear, supra,* the court considered the probative effect of evidence of a possible trend:

"The remaining factor under *Brown Shoe* is whether or not there is a trend toward vertical integration in the industry, and, if so, what effect this trend can be expected to have on concentration in the market of either supplier or buyer. It is clear on the present record that the proposed acquisition is the first attempt toward vertical integration. However, the plaintiff's expert opined that consummation of the proposed acquisition would trigger further vertical acquisitions, on the theory that Combustion's need to overcome high ore costs is not unique, and supports the inference that similar acquisitions by the NSSS manufacturers would follow.

Assuming that further integration will occur, it is difficult to determine what effects, if any, the acquisition will have on concentration in either market area. There are presently 47 companies or joint ventures actively exploring for uranium deposits, and 17 operating uranium mining facilities. Moreover, United Nuclear's market share of 15% of proven ore reserves is based solely on $8 per pound uranium, and in no way takes into account the substantial uranium reserves which the AEC has acquired through its purchase programs. In the NSSS market, with its four participants, no firm prediction can be made." 302 F.Supp. 556.

We conclude that under the *Brown Shoe* rule the trend is only of consequence if the probable future effect of the merger under examination may be substantially to lessen competition.

The evidence of trend cited by the government was largely over when Hammermill purchased Carter Rice. It had acquired WNU in 1960 and had operated it for a period of six years without any hint of government anti-trust inquiry. During this period, and without any pre-litigation motivation, it had conducted WNU as a separate profit center without any evidence of a purpose or intent to foreclose access by competitors. Nor has the government shown that the trend to acquisition has led to any increase in concentration in the industry.

An important consideration in *Brown Shoe* was the fact that the intent and purpose of Brown to foreclose was manifest in

the evidence, and Brown was the leader and instigator of the trend [307 U.S. at p. 302]. Hammermill, on the other hand, had a policy of favoring distribution through a large number of independent paper merchant houses, it was recognized in the industry as strongly committed to that policy, and only acquired the two houses in question at widely spaced intervals, for motives, at least in part, of having their operations continued in the traditional pattern of independent paper merchant houses.

The trend having substantially ended before Hammermill's acquisition of Carter Rice, the Carter Rice acquisition being the instigating force of the Government antitrust investigation of Hammermill, the dearth of evidence of an intent or purpose to foreclose, and the lack of evidence that any trend was leading to concentration in the industry, all make any evidence of a trend insufficient to forecast the probable future effect of the acquisitions in question here.

### SUMMARY FINDINGS OF FACT

■ There were few disagreements between the parties on basic facts; all disputes concerned interpretations, inferences and conclusions to be drawn therefrom, the relevancy of facts to prove the ultimate issues and the legal consequences of these facts. Because we were involved in a vertical integration where the share of the market foreclosed does not approach monopoly proportions it became necessary to undertake an examination of various economic and historical factors in order to determine whether the arrangement under review is of the type Congress sought to proscribe. The courts have, in the light of Congress' expressed intent, recognized the relevance and importance of economic data that places every given merger under consideration within an industry framework almost unique in every case. See *Brown Shoe, supra,* fn. 38, and p. 329, 82 S.Ct. 1502.

The court finds from the evidence that:

1. The manufacture and sale of printing and fine papers is not a concentrated line of commerce.

2. There is no trend to concentration in this line of commerce.

3. The market share of Hammermill in this line of commerce does not approach monopolistic proportions, is relatively stable, and did not increase after the acquisitions.

4. The combined market shares of the purchasing firms in this line of commerce do not approach monopolistic proportions.

5. The total sales of the purchasing firms are not the measure of potential foreclosure because of Hammermill's long standing prior relationship to them, the inability of Hammermill to supply all their requirements, and the need of Hammermill to supply a large number of established paper merchant customers.

6. The possibility of foreclosure of access by manufacturers is barred by:
 a) Ease of entry into the paper merchant business;
 b) Relative ease of entry of other paper manufacturers into the printing and fine paper lines by conversion of existing facilities to mass produce competing less expensive grades;
 c) The growth and dominance of direct sales in the distribution system.

7. The possibility of any attempt by Hammermill to foreclose access by other manufacturers to its owned paper merchants is barred by:
 a) The traditional function of a paper merchant as a supplier of a wide line of products of many manufacturers;
 b) Hammermill's historic policy of distribution through paper merchants;
 c) Hammermill's dependence upon the continued good will of a large group of independent paper merchants which would be damaged by any attempt to force its produce on its owned houses;
 d) The successful and profitable operation of these owned houses under Hammermill's separate profit center concept.

8. There is no evidence to support a conclusion that prior to acquisition Hammermill intended to acquire these paper merchant houses to dispose of excess productive capacity, or to enter new markets, or acquire new customers, or to foreclose access to them by other manufacturers, and there is no evidence to support any such conclusion from its operations after the acquisition.

9. There is no evidence to support a conclusion that Hammermill's acquisition of these merchant paper houses was part of a trend of acquisition for the purpose of foreclosing competition by other paper manufacturers, and there is no evidence that any trend of acquisition has resulted in greater concentration in the manufacture and sale of printing and fine paper.

10. From all the evidence in the case the court finds that the United States has not carried its burden of proof that the effect of the acquisition of Western Newspaper Union and Carter Rice Storrs and Bement, Inc. by Hammermill Paper Company may be substantially to lessen competition in the manufacture and sale of printing and fine paper in the United States.

### CONCLUSIONS OF LAW

[10] 1. This court has jurisdiction over the parties and the subject matter;

2. Venue is proper in this judicial district;

3. The following is the line of commerce within the meaning of Section 7 of the Clayton Act:

The manufacture and sale of printing and fine paper;

4. As to this line of commerce the United States as a whole is the appropriate section of the country within the meaning of Section 7 of the Clayton Act;

5. The effect of the acquisition by Hammermill Paper Company of the assets of Western Newspaper Union and the capital stock of Carter Rice Storrs and Bement, Inc. will not be substantially to lessen competition in the lines of manufacture and sale of printing and fine paper;

6. The acquisitions of the stock of Carter Rice Storrs and Bement, Inc. and the assets of Western Newspaper Union by Hammermill Paper Company are not violations of Section 7 of the Clayton Act.